**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**PATRICK MARLOWE**

               **Petitioner,**

**v.**

                                         **Civil No.: 5:17CV111**
                                         **JUDGE BAILEY**

**WARDEN. FCI HAZELTON**

               **Respondent**.

**REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

On July 19, 2017, counsel filed  a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 on behalf of the petitioner, Patrick Marlowe. ECF No. 1. Counsel, Jeremy Gordon, has been granted leave to appear *pro hoc vice*. ECF No. 4. The petitioner is a federal inmate, who was housed at FCI Hazelton when this petition was filed and is challenging the validity of his life sentence imposed in the Middle District of Tennessee. On May 16, 2019, the respondent was directed to show cause why the Petition should not be granted. ECF No. 6. On June 19, 2019, respondent filed a Motion to Dismiss for Lack of Jurisdiction with a supporting memorandum. ECF No. 10. On June 21, 2019, the petitioner filed a Response. ECF No. 11. The undersigned now enters this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL AND PROCEDURAL HISTORY[1]

### A. Conviction and Sentence

The petitioner, who is a former correctional officer at the Wilson County Jail, and four other defendants[2] were charged in an eight count indictment with conspiring to violate the civil rights of various named persons who were in their lawful custody and with substantive criminal violations of such persons' civil rights. ECF No. 1. The petitioner was named in all eight counts.

The conspiracy count alleged that between July 2001 and January 2003, the petitioner and his codefendants conspired to "injure, oppress, threaten and intimidate detainees and prisoners at the Wilson County Jail in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely the rights not to be deprived of liberty without due proves of law and to be free from cruel and unusual punishment while in official custody and detention." 18 U.S.C. § 241. It was alleged that as the means, manner, and object of the conspiracy, the conspirators would punish, harm, and intimidate by striking, punching, kicking, and assaulting detainees and prisoners; discuss and brag about the assaults, including

---

[1] Unless otherwise noted, the information in this section is taken from Marlowe's criminal docket available on PACER and all ECF numbers are from that case.  See United States v. Marlowe, (No. 3:04-cr-00129).  Philips v. Pitt Cnty. Mem. Hosp., 572 F. 3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of public record); Colonial Penn. Ins. Co. v. Coil, 887 F.2d 1236, 21239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the contents of court records.'"). .

[2] The other individuals named in the indictment were Gary Hale, Tommy Shane Conaster, Robert Brian Ferrell, and Robert Locke. Hale entered a plea of guilty to Count 1 of the indictment and was sentenced to 108 months imprisonment. Robert Ferrell entered a plea of guilty to Count 7 of the indictment and was sentenced to 12 months' imprisonment. In a joint trial with the petitioner, Tommy Connaster was found guilty of Count 1 and sentenced to 70 months imprisonment and Robert Locke was acquitted.

keeping an oral "knockout list" of those individuals who had been rendered unconscious during an assault; and conceal such assaults by withholding medical care and falsifying incident reports. ECF No. 1 at p. 1. Nineteen overt acts were alleged in furtherance of the conspiracy [ECF No. 1 at pp. 2-4], seven of which were charged as substantive offenses. The substantive counts asserted that the various defendants, aided and abetted by each other, assaulted certain prisoners and detainees in violation of their civil rights. 18 U.S.C. § 242 and 2. With respect to the petitioner, the most serious charges were counts two and three  because each alleged that the petitioner's conduct resulted in the death of Walter Kuntz, a detainee.

The evidence[3] established that on January 23, 2003, Kuntz was involved in a minor accident and was apprehended at a convenience store after leaving the scene. He struggled briefly with officers during the arrest and complained about an injury to his lip. When Kuntz was brought to the jail at 3:30 p.m., the only injuries noted were discoloration of his lips and an abrasion to his forehead. After being booked, Kuntz was placed in the detox cell where he began screaming and banging on the cell door. The petitioner told him to be quiet, but he would not. When the petitioner and Finley entered the cell, Kuntz threw a roll of toilet paper at the petitioner, who then punched Kuntz in the left side of his head, threw him toward the wall, and kicked, punched, and kneed him in the rib area. Kuntz was screaming when they left the cell but quieted down for about thirty minutes before continuing to bang on the cell door. Finley testified that the petitioner got more agitated, then went back into the cell with Finley and another officer

---

[3] Although trial transcripts were prepared, they are not available on PACER. The recitation of the evidence is taken nearly verbatim from the Sixth Circuit opinion affirming the petitioner's conviction. See No. 06-5946, Doc. 74, February 4, 2008. It should be noted that the only other correctional officer mentioned in this recitation who was named in the indictment was Gary Hale.

3

named Donald Willis. Willis testified that Kuntz was standing up but was not aggressive. The petitioner struck Kuntz in the left temple area, knocking him down, and then punched and kicked Kuntz some more. Willis sprayed Kuntz with a chemical agent as they left the cell.

Kuntz was quiet for a time, but then started to yell and kick the cell door again. Hale testified that at approximately 5:00 p.m., the petitioner told him that he had already hit Kuntz in the head and instructed Hale to "take care of the situation." Hale understood the petitioner to mean that he should do whatever it took to make him stop beating the door. This time, Hale, Finley, and Willis went into the detox cell.  Kuntz backed away, and Hale pushed him into the bench next to the wall. The right side of Kuntz's head was facing Hale and the left side was four or five inches from the wall. Hale admitted that he delivered three or four "full power" punches to the right side of Kunz's head. Each time, the left side of Kuntz's head bounced off the wall and made a "cracking sound." The officers left Kuntz holding his head and moaning. Hale told the petitioner that he had "taken care of it."

Willis took a call from Kuntz's mother, who advised him that Kuntz had undergone brain surgery a year or two earlier. Willis told Hale and the petitioner about the call. Hale looked worried, but nothing was done. When Hale returned to the cell at 6:00 p.m. to advise Kuntz of the charges, Kuntz was conscious but did not respond to Hale. Between 7:00 and 7:30 p.m., Hale returned and found Kuntz lying on the bench, "passed out" in his own vomit. The petitioner and Hale had an inmate clean Kuntz up and turn him, so he did not choke if he vomited again. Kuntz was not responsive, but no medical attention was ordered. The petitioner testified that he thought Kuntz was extremely drunk and might have taken some pills.

Between 8:45 and 9:00 p.m., Hale went into the cell and found that Kuntz had vomited again. Hale and the petitioner cleaned him up and tried to arouse him by shaking him, patting him, and pouring a bucket of ice water over him. Kuntz did not move or show any signs of consciousness. Hale and the petitioner used ammonia smelling salts, which did not arouse him. They noticed that Kuntz would stop breathing until the salts were taken away. No steps were taken to get medical care at that time.

In the next hour, Willis checked on Kuntz and found him lying down with his eyes open. Kuntz did not respond to being shaken or having a light shown in his eyes. Willis alerted the petitioner, but nothing was done. At 10:00 p.m., Hale suggested they call his father, who was a judicial commissioner and had some EMT experience. The petitioner agreed. Hale's father arrived at approximately 11:00 p.m. and recommended that they call an ambulance. At that time, Hale told Finley not to worry about writing a report because he and the petitioner would take care of it.

When the ambulance arrived a little after 11:30 p.m., the EMTs evaluated Kuntz and determined that he was a level three on the level of consciousness scale-- the same level as a deceased person. The EMTs had been dispatched for a case of possible alcohol poisoning, and neither the petitioner nor Hale told them or Hale's father that Kuntz had received repeated blows to the head. There was evidence that if the EMTs had known that Kuntz might have a head injury, he would have been airlifted directly to a trauma center. Instead, Kuntz went to a local Medical Center. Upon examination, doctors noted that Kuntz was wet, and his body temperature was ten degrees below normal. After a brain scan, Kuntz was then flown to a trauma center.

A neurosurgeon evaluated Kuntz, who was on a ventilator and had no brain stem reflexes. The doctor concluded he had a very large subdural hematoma that had caused

irreversible brain damage. He added that Kuntz's low body temperature had exacerbated his condition because it interfered with normal clotting. Kuntz died when he was removed from the ventilator two days later.

Several doctors testified at trial that Kuntz's head injuries were consistent with blunt force trauma, and that such injuries are generally treatable if medical attention is sought in the first hours after a brain injury. It was also explained that within an hour of injury a person with a subdural hematoma would start to experience a progression of symptoms such as dizziness, headache, nausea, vomiting, sleeplessness, lethargic, and eventually unresponsiveness.

On January 26, 2006, following a twelve-day jury trial, the petitioner was found guilty on all Counts of the indictment except Count 8.[4] Regarding Count 2 of the indictment[5], the jury found that bodily injury to Kuntz resulted from acts that violated 18

---

[4] Count 8 charged that:

> On or about September 10, 2002, in the Middle District of Tennessee, defendants **PATRICK MARLLOWE, ROBERT BRIAN FERRELL**, and persons known to the Grand Jury, then employed as correctional officers at the Wilson County Sheriff's Department and while acting under color of law, aided and abetted by each other, struck and assaulted Larry Clark, then a detainee at the Wilson County Jail, resulting in bodily injury to Larry Clark, and thereby willfully deprived Larry Clark of the right secured and protected by the Constitution and Laws of the United States not to be deprived of liberty without due process of law.
>
> In violation of Title 18, United States Code, Sections 242 and 2.

[5] Count 2 charged that:

> On or about January 12, 2003, in the middle District of Tennessee, defendant **PATRICK MARLOWE** and**, GARY HALE**, then employed as correctional officers at the Wilson County Sheriff's Department and while acting, under color of law, aided and abetted by each other, struck and assaulted Walter Kuntz, then a detainee at the Wilson Co. Jail, resulting in bodily injury to and the death of Walter Kuntz, and thereby willfully deprived Walter Kuntz of the right secured and protected by the Constitution and laws of the United States not to be deprived of liberty without due process of law

U.S.C. § 242, but that his death did not result from those acts. ECF No. 185 at p. 2. However, with respect to Count 3[6] of the indictment the jury not only found the petitioner guilty of violating 18 U.S.C. 242, it also found that Kuntz's death resulted from said violation.

On April 7, 2006, a Presentence Investigation Report ("PSR") was prepared by the United States Probation Office.[7] As noted in the PSR, the statutory sentence for Count 1 was not more than ten years pursuant to 18 U.S.C. 241. With respect to Counts 2, 4, 5, 6, and 7, the statutory sentence was not more than ten years on each count. 18 U.S.C. § 242. With respect to Count 3, the statutory sentence was life imprisonment pursuant to 18 U.S.C. 242.[8] With respect to the sentencing  guidelines, the PSR calculated petitioner's advisory guidelines sentence with respect to Count 3 based upon the range applicable to second-degree murder. Accordingly, his base offense level was thirty-three. Six levels were added because the offense was committed under color of

---

In violation of Title 18, United States Code, Sections 242 and 2.

[6] Count 3 charged that:

On or about January 12, 2003, in the Middle District of Tennessee, defendants **PATRICK MARLOWE** and **GARY HALE**, then employed as correctional officers at the Wilson County Sheriff's Department and while acting under color of law, aided and abetted by each other, willfully failed to provide necessary and appropriate medical care and treatment to Walter Kuntz, resulting in bodily injury to and the death of Walter Kuntz, and thereby willfully deprived Walter Kuntz of the right secured and protected by the Constitution and laws of the United States not to be deprived of liberty without due process of law.

In violation of Title 18, United State Code, Sections 242 and 2.

[7] The undersigned was provided with a copy of the PSR by the sentencing court.

[8] 18 U.S.C. § 242 provides that if death results from the acts committed in violation of this section, the defendant shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death. It is the undersigned's understanding that in preparing a PSR, probation officers list the maximum term of imprisonment permitted by the statute.

law inasmuch as the petitioner was a correctional officer and sergeant at the Wilson County Jail at the time of the offense. Two levels were added because the petitioner physically restrained the prisoners and detainees during the offense. Specifically, Walter Kuntz was confined to a detox cell and could not escape during the beatings. Four levels were added because the petitioner was an organizer or leader of a criminal activity that involved five or more participants. Specifically, the petitioner was a sergeant with the Wilson County Jail on the second shift and acted in a supervisory capacity and gave instructions and orders to several correctional officers daily. Finally, two levels were added because the petitioner willfully obstructed or impeded or attempted to obstruct or impede the administration of justice by providing materially false information to TBI agents on two occasions after the death of Walter Kuntz and instructed other officers to falsify information as well. Accordingly, the petitioner's adjusted offense level was 47. In addition, the Petitioner's adjusted offense level for Count Group Two (aggravated assault of Paul Armes, Counts 1 and 4) was 31. His Adjusted Offense Level for Count Group 3 (aggravated assault of Sergio Martinez, Counts 1 and 5) was 31. His Adjusted Offense Level for Count Group Four (assault of Kenneth McIntyre, Counts 1 and 6) was twenty-four. Finally, his Adjusted Offense Level for Count Group 5 (assault of Dartanian McGee, Counts 1 and 7) was 24. Accordingly, his highest adjusted offense level was forty-seven with no Chapter Four enhancements. His criminal history computation resulted in zero points establishing a Criminal History Category I. The 2002 edition of the Guidelines Manual was used in this case. With an Adjusted  Offense Level of 47, regardless of his Criminal History Category, the guideline range was life.

On June 29, 2006, the Government filed its Position with Respect to Sentencing. ECF No. 271. As an initial matter, the Government noted its belief that the United States

Probation Officer erred in failing to apply the enhancement for obstruction of justice to the offenses that comprised Groups Two through Five. However, the Government acknowledged that the imposition of the obstruction enhancement on Groups Two through Five would not affect the petitioner's overall Sentencing Guidelines offense level or sentencing range. The Government then submitted its position that a sentence within the guidelines range was reasonable under the facts of the case, and there were no factors under 18 U.S.C. § 3553(a) which would warrant a deviation from that range.

On July 3, 2006, the petitioner's trial counsel filed a Sentencing Memorandum which requested that the court use its discretion to sentence him below the advisory guidelines range because that range was greater than necessary to reflect the seriousness of the offense or to satisfy the purpose of just punishment under 18 U.S.C. § 3553(a). ECF No. 275. In support of this request, counsel noted that during  the time period when the offenses occurred, the jail had almost twice the number of inmates that should have been housed in the facility and the number of guards per shift was grossly insufficient. In addition, counsel argued that guards were not trained sufficiently and were given no medical training. He also argued that the petitioner was 23 at the time he was made sergeant of the guard and had no specific leadership training and minimal experience. Counsel also contended that the guideline range as determined under U.S.S.G. §§ 2A1.1 and 2A1.2 was unconstitutional in violation of the Fifth and Sixth Amendments, because the jury should have decided beyond a reasonable doubt whether the petitioner's conduct in Count 3 amounted to second degree murder or involuntary manslaughter.

The sentencing hearing was conducted on July 6, 2006. ECF No. 278. Judgment was entered on July 7, 2006. ECF No. 282. The petitioner was sentenced to ten years

on Count 1, concurrent with all other counts, as well as ten years each on Counts 2, 4, 5, 6 and 7 and all concurrent with all other counts. In addition, the petitioner was sentenced to life on Count 3, concurrent with all other counts.

### B. Direct Appeal

On July 13, 2016, the petitioner filed a Notice of Appeal. ECF No. 284. The petitioner filed an appeal only from the life sentence imposed on Count 3 and did not challenge the decision to sentence him to the statutory maximum of 10 years' imprisonment on Counts 1, 2, 4, 5, 6 and 7. Specifically, the petitioner challenged the guidelines calculation and maintained that the facts did not support the conclusion that the underlying homicide offense, that is causing Kuntz's death by denying him medical care, involved the "malice aforethought" that distinguishes second decree murder from manslaughter under federal law. However, the Sixth Circuit concluded that it was not clearly erroneous for the district judge to conclude that the petitioner's conduct so grossly deviated from a reasonable standard that he must have been aware of a serious risk of death or serious injury.

The petitioner also argued that his sentence was procedurally unreasonable because the district judge neglected to consider the other § 3553(a) factors and did not articulate the reasons for imposing the life sentence. However, the Sixth Circuit concluded that the district judge made a reasonable determination as to the appropriate sentence considering the purposes of § 3553(a). Therefore, the appellate court found that the petitioner's sentence, while harsh, was not substantially unreasonable.

Finally, the petitioner sought reversal of his life sentence on the grounds that it was unconstitutionally imposed in violation of the Fifth and Sixth Amendments. More specifically, he argued that his sentence was unconstitutional because it was based on a

10

fact not admitted by him or found by the jury. However, the Sixth Circuit concluded that because the district court recognized the advisory nature of the guidelines, the increase a sentence on facts not admitted by the petitioner or proven to a jury beyond a reasonable doubt did not violate the Sixth Amendment. Additionally, the Sixth Circuit found that judicial fact-finding in sentencing proceedings using a preponderance of the evidence post-Booker does not violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury. Accordingly, the petitioner's sentence was affirmed. ECF No. 294.

On May 8, 2008, the petitioner filed a Petition for Writ of Certiorari. ECF No. 296. On October 15, 2008, the petition was denied. ECF No. 297.

### C. Motion to Vacate

On October 5, 2009, the petitioner, by counsel, filed a Motion to Vacate, Set Aside, or Correct Conviction and Sentence under 28 U.S.C. § 2255.[9]  The petitioner alleged  that his counsel rendered constitutionally ineffective representation prior to trial by (1) failing to correctly calculate and advise him of the sentence he faced if found guilty, and (2) failing to recommend that he accept the government's plea offer`.[10]

On February 12, 2010, the district court entered a decision denying the petition. The district judge gave a lengthy recital of the decision issued by the Sixth Circuit in denying the petitioner's direct appeal. The district judge also thoroughly set forth the standard for establishing ineffective assistance of counsel. The court then found it was unnecessary to hold an evidentiary hearing because the record conclusively established

---

[9] See 3:09cv932 (Middle District of Tennessee) available on PACER.

[10] A review of the materials filed in the § 2255 petition indicates that the government offered the petitioner a 15 year sentence in exchange for a guilty plea.

that the petitioner was not entitled to relief. In addition, the district judge indicated that a certificate of appealability would not issue because the petitioner had failed to make a substantial showing of the denial of a constitutional right.

On March 12, 2010, the petitioner filed a Notice of Appeal. On December 22, 2010, the Sixth Circuit denied the petitioner's application for certificate of appealability.

### III.     The Instant § 2241 Petition

#### A.  The Petition

In support of his § 2241 petition before this Court, the petitioner relies on the decision in Burrage v. United States, 571 U.S. 204 (2014). More specifically, the petitioner argues at the time of his § 2255 motion, the law in the Sixth Circuit did not require a finding of "but for" causation for the enhanced statutory maximum under 18 U.S.C. § 242. The petitioner further alleges that two courts of appeals and at least one district court have held that Burrage is retroactively applicable to cases on collateral review. The petitioner then argues that because Burrage calls into question his conviction on Count 3 and the resulting life sentence, a sentence in excess of the otherwise statutory maximum, this Court should grant him relief in the form of immediate discharge.

#### B.  Respondent's Motion to Dismiss

In support of his motion to dismiss, Respondent argues that Burrage is wholly inapplicable to the sentencing enhancement that the petitioner challenges in this case. Moreover, the respondent maintains that Burrage is not retroactive, and therefore, the petitioner cannot capitalize on its holding to attack his sentence.   Accordingly, the respondent requests that the Court dismiss this petition for lack of jurisdiction.

#### C.  Petitioners' Response

In his response, the petitioner points out that while the Fourth Circuit has not held Burrage to be retroactive, the undersigned's Order to Show Cause noted that the Sixth Circuit has joined the Fifth, Seventh and Eighth Circuits in ruling that Burrage announced a substantive rule that applies retroactively on collateral review. In addition, the petitioner opines that the fact that Burrage arose in the context of a different statute than 18 U.S.C. § 242 is irrelevant.

## LEGAL STANDARDS

### A. Motion to Dismiss Under Fed.R.Civ.P. 12(b)(1)

A party may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991) (citing  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). In deciding whether jurisdiction exists, a court is to consider the pleadings as mere evidence and may consider evidence outside the pleadings without converting the proceedings to one for summary judgment. Id.  Whenever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. Fed. R. Civ. P. 12(h)(3).

### B.  Post-Conviction Remedies and Relief

Despite the title he affixes to his petition, the petitioner unequivocally challenges the validity of his sentence and not the execution of his sentence, as such his filing is not a habeas petition under 28 U.S.C. § 2241; but rather, it is a Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255. The law is well settled that § 2255 is the exclusive remedy for challenging the validity of a

federal judgment and sentence. See In re Vial, 115 F.3d 1192, 1193 (4th Cir. 1997). A petition for a writ of habeas corpus under § 2241 is not an additional, alternative or supplemental remedy to that prescribed under § 2255.

However, § 2255(e) provides a "savings clause" exception which serves as a means for petitioners to apply for a traditional writ of habeas pursuant to § 2241. It states:

> An application for a writ of habeas corpus on behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255(3) (emphasis added). The savings clause will occasionally allow a § 2241 petition to take the place of a § 2255 motion, but not "merely … because an individual is procedurally barred from filing a Section 2255 motion," Vial, 115 F.3d at 1194 n.5, nor simply because relief is unavailable due to the gatekeeping provisions of § 2255. Young v. Conley, 128 Fed Supp.2d 354, 357 (S.D.W. Va. 2001). Instead, to trigger the savings clause in the context of a challenge to the validity of a conviction, the petitioner's claim must contain all three of the following characteristics: (1) at the time of his conviction, the settled law of this circuit or the Supreme Court established the legality of his conviction; (2) subsequent to his direct appeal and first 2255 motion, the substantive law changed such that the conduct of which he was convicted is now deemed not to be criminal; and (3) he cannot satisfy the gatekeeping provisions of 2255 because the new rule is not one of constitutional law. In re Jones, 226 F.3d at 328, 333-34 (4th Cir. 2000). With respect to challenges involving the validity of a sentence, the savings clause is available only when the petitioner can establish that: (1) at the time of sentencing, settled law of this circuit or the Supreme Court established the legality of the sentence; (2)

subsequent to his direct appeal and first 2255 motion, the aforementioned settled substantive law changed and was deemed to apply retroactively on collateral review; (3) he cannot satisfy the gatekeeping provisions of 2255(h)(2) for second or successive motions; and (4) due to this retroactive change, the sentence now presents an error sufficiently grave to be deemed a fundamental defect. United States v. Wheeler, 886 F.3rd 415, 429 (4th Cir. 2018). The Fourth Circuit specified that a change of substantive law within the circuit, not solely in the Supreme Court, would be enough to satisfy the second prong of the four-part test established in Wheeler. Id. In addition, the Fourth Circuit held that the savings clause requirements are jurisdictional rather than procedural; therefore, if they are not met, the Court does not have jurisdiction to entertain the § 2241 petition. Id. at 426. The petitioner bears the burden of establishing that a § 2255 motion is inadequate or ineffective and that he satisfies the savings clause requirements. See Hood v. United States, 13 Fed Appx. 72, 2001 WL 648636, at *1 (4th Cir. 2001); McGee v. Hanberry, 604 F.2d 9, 10 (5th Cir. 1979); Hayes v. Ziegler, No. 5:11-cv-00261, 2014 WL 670850 (S.D.W. Va. February 20, 2014), aff'd, 573 Fed. Appx. 268 (4th Cir. 2014).

### III. ANALYSIS

As previously noted, the petitioner relies on the decision in Burrage to support his claim for relief. In that case, Marcus Burrage was charged with violating 21 U.S.C. § 841(a)(1) for distributing heroin to Joshua Banka who later died. The government alleged that Burrage was subject to the enhanced penalty because Barka's death "resulted from" the heroin use. Burrage, 571 U.S. at 207. Two medical experts testified regarding the cause of Banka's death. Id. The first testified that multiple drugs were present at the time of death and that only the heroin was above the therapeutic range, but he was not sure "whether Bank would have lived had he not taken the heroin." Id. That expert further

15

opined  that the combined drugs caused "respiratory and/or central nervous system depression" and the heroin was a "contributing factor" to Banka's death. Id. The second expert also testified that the heroin played a "contributing role," but could not say whether Banka would have lived had he not taken the heroin. Id. at 8208. The jury was instructed that the government only had to prove that the heroin was a "contributing cause" of death.[11] Id. Burrage was convicted and received the enhanced penalty. Id. The Eight Circuit affirmed. United States v. Burrage, 687 F.3d 1015 (8th Cir. 2012).

The Supreme Court rejected the Eighth Circuit's contributing cause standard by stating: "The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." Burrage, 571 U.S. 216. Instead, the court held: "at least where the use of the drug distributed by the defendants is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death. Id. 218-19.  The Supreme Court defined "but for" as requiring "proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct. Id. at 211.  The Court noted that because the statutory "'death results' enhancement increased the minimum and maximum sentences to which Burrage was

---

[11] The precise instruction was:

> For you to find that a death resulted from the use of heroin, the Government must prove beyond a reasonable doubt, that the heroin distributed by the Defendant was a contributing cause of Joshua Banka's death. A contributing factor is a factor that, although not the primary cause, played a part in the death.

See ECF No 102, Case No. 4:10-cr-00095-RP-CFB (Southern District of Iowa. Available on PACER.

exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt. Id. at 209.  This proved critical in Burrage, because, although it was clear that the heroin contributed to an overall effect that caused the victim to stop breathing and die, no expert was willing to say that the victim would have died from the heroin use alone. Id. at 215.

The question then arises whether that decision is a substantive change in settled law that applies retroactively on collateral review. The Courts of Appeals are currently split on the question.

The Courts of Appeals for the Fifth, Sixth, Seventh, and Eighth Circuits have held that the rule is retroactive. See Harrington v. Ormond, 200 F.3d 246, 249 (6th Cir. 2018) ("It is also clear that Burrage is retroactive, as the Government commendably concedes. Substantive decisions that 'narrow the scope of a criminal statute by interpreting its terms' apply retroactively to cases on collateral review." (citations omitted)); Santillana v. Upton, 846 F.3d 779, 784 (5th Cir. 2017) ("In sum, as a substantive decision narrowing the scope [of] of a federal criminal statute, Burrage applies retroactively to cases on collateral review."); Gaylord v. United States, 829 F.3d 500, 505 (7th Cir. 2016) (holding that Barrage narrowed "the 'death results' enhancement of 841(b)(1)(C) and thus retroactively"); Krieger v. United States, 842 F.3d 490, 497-500 (7th Cir. 2016) (collecting cases in which the Government conceded that Barrage announces a substantive rule that must be applied retroactively on collateral review and holding that, even without the concession, the Court would reach the same conclusion); Ragland v. United States, 784 F.3d 1213, 1214 (8th Cir. 2015) (accepting a similar concession by the Government). However, the Third and Fourth Circuits have reached opposite conclusions. See Dixon v. Warden of FCI Schuylkill, 647 F. App'x 62, 64 (3d Cir. 2016) (rejecting the argument that

Burrage is retroactive and concluding that a prisoner cannot rely on that case to bring a petition under 28 U.S.C. § 2241) and Atkins v. O'Brien, 148 F.Supp. 3d 547, 522 (N.D.W. Va. 2015) (holding that Burrage "has not been applied retroactively to cases on collateral review"); aff'd 647 F.Appx 254, 255 (4th Cir. 2016) (affirming "for the reasons stated by the district court").

In Hahn v. Moseley, the Fourth Circuit held that when evaluating substantive claims under the savings clause, the Court must "look to the substantive law of the circuit where the defendant was convicted." Hahn v. Moseley, 931 F.3d 295, 301 (4th Cir. July 24, 2019), citing In re Davenport, 147 F.3d 605, 611-12 (7th Cir. 1998); Eames v. Jones, 793 F. Supp.2d 747, 750 (E.D.N.C. 2011). Therefore, because the petitioner was convicted in the Middle District of Tennessee, which is in the Sixth Circuit, the undersigned begins his analysis with the understanding that Burrage is retroactive to cases on collateral review.

The decision in Burrage, as noted by the respondent, was issued under the Controlled Substances Act, and he argues that it is therefore inapplicable here where the petitioner was sentenced pursuant to an entirely different and unrelated statutory framework.

The Controlled Substances Act imposes mandatory minimum sentences that range from five years to life, depending on the quantity of drugs involved, the criminal history of the defendant and whether death or serious bodily injury results from the use of the drugs. Conversely, 18 U.S.C. § 242, provides for no mandatory minimum sentence for the deprivations of civil rights, but instead provides that:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or

immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results…shall be fined under this title or imprisoned more than ten years or both; and if death results from the acts committed in violation of this section . . . **shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.**

18 U.S.C. § 242 (emphasis added). The undersigned does not believe that the differences in the statutory sentencing language is enough to foreclose application of the decision in Burrage to the instant case. Moreover, although the petitioner cites to no case law that has applied Burrage to 18 U.S.C. § 242[12] in the context of a habeas petition, at least one case has applied it in the context of 18 U.S.C. 1347, which deals with health care fraud and provides as follows:

(a) Whoever knowingly and willfully executes of attempts to execute a scheme or artifice—

    (1) to defraud any health care benefit program; or

    (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody of, any health care benefit program, in connection with the delivery of payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury . . ., such person shall be fined under this this title or imprisoned not more than 20 years, or both; and if the violations results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

---

[12] In his Response to the Motion to Dismiss, the petitioner cites United States v, Gonzalez, 906 F.3d 784 (9th Cir. 2018), in which the Court of Appeals addressed the import of the holding in Burrage in connection with a conviction under 18 U.S.C. § 242 on direct appeal, in a case with facts very similar to those in the instant case. In Gonzalez, the court instructed the jury on the element of bodily injury as follows: "if you find a defendant guilty as charged in Count Two of the indictment, you must then determine whether the government has proven beyond a reasonable doubt that Mr. Carillow suffered a bodily injury, and that the bodily injury resulted from acts committed by that defendant."  The defendant argued that this instruction was deficient because it did not require the jury to find that each defendant's acts were the "proximate cause" of Carillow's injuries. However, the Ninth Circuit found that the Court in Burrage expressly declined to address whether proximate cause must also be shown. Burrage, 571 U.S. at 210.

In U.S. v. Schneider, 112 F.Supp.3d 1197112 F..Supp.3d 1197 (2015) a Doctor of Osteopathic Medicine and his wife, an LPN, were charged with health care fraud and health care fraud resulting in death in violation of 18 U.S.C. § 1347. From February 2002 to February 2008, sixty-eight patients died of drug overdoses. During that same period, over 100 patients were admitted to local hospitals for overdoses. The jury was instructed that if the defendants were found guilty of unlawful dispensing and/or health care fraud, that it must also determine whether those crimes resulted in serious bodily injury or death:

> If you find Stephen Schneider guilty of illegally dispensing controlled substances, as charged in Counts 2, 3, or 4, or any of them, you will then have to unanimously determine beyond a reasonable doubt whether the illegal dispensing of the specifically identified controlled substances resulted in serious bodily injury or death as to each of the three named individuals.
>
> As to Count 5, you will have to unanimously determine beyond a reasonable doubt which, if any, of the named 18 individuals suffered bodily injury or death as a result of the controlled substance(s) illegally dispensed by Stephen Schneider.

In addition, Counts 7, 8 and 9, charged that health care fraud resulted in serious bodily injury to or death of three individuals. The court instructed the jury that if they found a defendant guilty of any of those counts, they would then have to determine beyond a reasonable doubt if serious bodily injury or death resulted from the health care fraud:

> For you to find that serious bodily injury or death resulted from the health care fraud committed by a defendant, the government must prove beyond a reasonable doubt that the individual's serious bodily injury or death was a result of the health care fraud alleged.

After the close of evidence, the jury deliberated for seven days. The jury found Dr. Schneider guilty of Counts 1-17 and two money laundering counts. His wife was found guilty of all charges except two money laundering charges. The court sentenced Dr. Schneider to 360 months imprisonment on counts 1-5 and 7-9, to run concurrently. His

wife was sentenced to 396 months' imprisonment on counts 1-5 and 7-9, to run concurrently. The Tenth Circuit affirmed the convictions and sentences. Schneider, 704 F.3d 1287. Thereafter, both Dr. Schneider and his wife each filed a § 2255 motion which raised two substantive issues: (1) whether the Supreme Court decision in Burrage required the court to set aside their convictions and/or sentences on certain counts; and (2) whether their trial and appellate counsel were ineffective.

The court noted that the instructions utilized the statutory language, death "resulted from" the prescriptions, but did not instruct the jury that death must be caused by the prescription drugs. Nor was the jury instructed that the government was required to prove that the patients would not have died "but for" the prescriptions issued by Dr. Schneider. The court went on to find that the Burrage decision imposes a "new and stricter burden of proof that the government needs to prove in order to establish that 'death resulted' from the drug distribution." Therefore, the defendant's motion was granted in part, and their convictions on counts 2, 3, 5 and 7-9 were vacated.

In the habeas petition pending with this Court, the instruction to the jury was as follows:

> Now I want to talk about bodily injury or death. Finally, for Counts Two through Eight, you must decide whether the government has proved beyond a reasonable doubt that bodily injury to the alleged victims resulted from the acts of the defendants charged in those counts. For Counts Two and Three, you must also decide whether the government has proved beyond a reasonable doubt that Walter Kuntz's death resulted from the conduct of Defendant Marlowe.
>
> The government need only  prove that bodily injury or death was a natural and foreseeable result of the defendant's conduct. The government does not need to prove that a defendant intended to cause bodily injury or death

or that a defendant's acts were the direct, immediate or sole cause of bodily injury or death.[13]

Clearly, this instruction fails to meet the standard set forth in <u>Burrage</u>. Although it utilized the statutory language, death resulted from, it did not instruct the jury that Kuntz's death must be caused by Kuntz's failure to provide necessary and appropriate medical care, nor did it instruct the jury that the government was required to prove that Kuntz would not have died "but for" the petitioner's failure to provide necessary and appropriate medical care. In fact, it specifically instructed the jury that the petitioner's inactions need not be the immediate or sole cause of his death.

Accordingly, the undersigned concludes that the petitioner has satisfied the savings clause that renders his conviction on Count 3 and resulting life sentence invalid. First, at the time of his conviction, the settled law of the Sixth Circuit established the legality of his conviction and sentence. Second, subsequent to his appeal and 2255 motion, the substantive law changed and has been deemed to apply retroactively on collateral review by the Sixth Circuit. Third, the petitioner cannot meet the gatekeeping requirements of 2255(h)(2) for second or successive motions. Finally, with respect to his life sentence, the sentence now presents an error sufficiently grave to be deemed a fundamental defect inasmuch as his sentence without the death finding could not exceed 10 years.

In tendering this Report and Recommendation, the undersigned acknowledges that the Fourth Circuit has determined in at least one case on direct appeal, that the district court was not required to give a clarifying instruction advising the jury that it could

---

[13] Case 3:04cr129, ECF No. 288 at p. 1954. In addition to the PSR, the sentencing court also provided the undersigned with the portion of the trial transcript containing the jury charge.

not convict if it found that heroin was only a contributing cause of the victim's death. See United States v. Alvarado, 816 F.3d 242 (2016). In that case, the medical examiner, who performed the autopsy on the victim, gave her opinion that he died of "heroin intoxication." While she acknowledged that the victim also had Xanax and Benadryl in his system at the time of his death, she testified that neither "contributed to" his death. She further explained that, "without the heroin, [Thomas] doesn't die." Id. at 246. After discussing the Burrage decision, the Fourth Circuit concluded that the district court did not abuse its discretion in refusing to clarify "results from."[14] The Fourth Circuit found that there was no evidence in the case that would allow a jury to find that heroin was only a nonessential contributing cause of Thomas' death." The same is not true in the instant case. Again, although the trial transcripts are not accessible, and the respondent did not provide what might be relevant portions, there appears to be no evidence that the petitioner died due to the petitioner's failure to provide medical assistance. Stated differently, there appears to be no evidence that demonstrated that the petitioner would not have died if the petitioner had sought medical assistance sooner than he did.

---

[14] The district judge instructed the jury:

> If you find the government has proved beyond a reasonable doubt that the defendant knowingly or intentionally distributed a mixture or substance containing a detectable amount of heroin on or about March 29, 201, you must then determine whether the government has proved beyond a reasonable doubt that death resulted from the use of such substance.

816 F.3d at 246. During deliberations, the jury as whether "the phrase 'death resulted from the use of the heroin' meant 'solely' from the use of the heroin or that the heroin contributed to [Thomas'] death." Id. Later in deliberations, the jury submitted essentially the same question: "The jury would like clarification … the section that says: 'death resulted from the use of the heroin.' Should that be interpreted as meaning death resulted 'exclusively' from the heroin or the heroin contributed to the death?" Id. at 247.

23

In conclusion, the undersigned recognizes that the petitioner did not receive a statutory sentence, but instead was sentenced pursuant to the United States Sentencing Guidelines after they became advisory. As noted above, the petitioner's base offense level was calculated pursuant to U.S.S.G § 2A1.2. The Fourth Circuit has ruled that "the Guideline lack[ ] legal force, and "an advisory Guidelines classification [i]s unlike a violation of a statute or constitutional provision." Lester v. Flournoy, 909 F.3d 708, 715 (4th Cir. 2018). Therefore, a misclassification of a petitioner as a career offender under the advisory Guidelines,  does not result in a fundamental defect that inherently results in a miscarriage of justice. United States v. Foote, 784 F.3d 931, 940, 944 (4th Cir. 2015). However, in the instant case, application of §2A1.2 for second degree murder was only permissible following the jury's finding that the petitioner's inaction caused Kuntz's death. Because that finding is no longer valid under Burrage, the petitioner is not subject to the enhanced guidelines.

## VI. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that: respondent's Motion to Dismiss [ECF No.10] be **DENIED**  and the Petition [ECF No. 1] be **GRANTED.**

Each party shall have **fourteen (14) days** from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District Judge.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.**  28 U.S.C. §636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED:  January 31, 2020

*/s, James P. Mazzone*
JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE