IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

**PATRICK MARLOWE**,

            Petitioner,

v.                              **Civil Action No. 5:17-CV-111**
                                          Judge Bailey

**WARDEN. FCI HAZELTON**,

            Respondent.

**MEMORANDUM OPINION AND ORDER DECLINING
TO ADOPT REPORT & RECOMMENDATION DENYING
PETITIONER'S MOTION TO VACATE AND DISMISSING ACTION**

Pending before this Court are petitioner's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 [Doc. 1] and Magistrate Judge Mazzone's Report and Recommendation (R&R) [Doc. 13], in which he recommends that the Petition be granted.

**Background**

The procedural history of this case is set forth in detail in the R&R and will not be repeated here. This Court will, however, reiterate some of the factual underpinnings of the case.

The petitioner is a federal inmate, who was housed at FCI Hazelton when this petition was filed and is challenging the validity of his life sentence imposed in the Middle District of Tennessee. The petitioner is a former correctional officer at the Wilson County Jail, who along with four other defendants, was charged in an eight count indictment with conspiring to violate the civil rights of various named persons who were in their lawful

custody and with substantive criminal violations of such persons' civil rights.  The petitioner was named in all eight counts.

The conspiracy count alleged that between July 2001 and January 2003, the petitioner and his codefendants conspired to "injure, oppress, threaten and intimidate detainees and prisoners at the Wilson County Jail in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely the rights not to be deprived of liberty without due process of law and to be free from cruel and unusual punishment while in official custody and detention." 18 U.S.C. § 241.  It was alleged that as the means, manner, and object of the conspiracy, the conspirators would punish, harm, and intimidate by striking, punching, kicking, and assaulting detainees and prisoners; discuss and brag about the assaults, including keeping an oral "knockout list" of those individuals who had been rendered unconscious during an assault; and conceal such assaults by withholding medical care and falsifying incident reports. Nineteen overt acts were alleged in furtherance of the conspiracy, seven of which were charged as substantive offenses.  The substantive counts asserted that the various defendants, aided and abetted by each other, assaulted certain prisoners and detainees in violation of their civil rights. 18 U.S.C. § 242 and 2.  With respect to the petitioner, the most serious charges were counts two and three because each alleged that the petitioner's conduct resulted in the death of Walter Kuntz, a detainee.

The evidence established that on January 23, 2003, Kuntz was involved in a minor accident and was apprehended at a convenience store after leaving the scene.  He struggled briefly with officers during the arrest and complained about an injury to his lip.  When Kuntz was brought to the jail at 3:30 p.m., the only injuries noted were discoloration

of his lips and an abrasion to his forehead.

After being booked, Kuntz was placed in the detox cell where he began screaming and banging on the cell door. The petitioner told him to be quiet, but he would not. When the petitioner and Finley entered the cell, Kuntz threw a roll of toilet paper at the petitioner, who then punched Kuntz in the left side of his head, threw him toward the wall, and kicked, punched, and kneed him in the rib area. Kuntz was screaming when they left the cell but quieted down for about thirty minutes before continuing to bang on the cell door. Finley testified that the petitioner got more agitated, then went back into the cell with Finley and another officer named Donald Willis. Willis testified that Kuntz was standing up but was not aggressive. The petitioner struck Kuntz in the left temple area, knocking him down, and then punched and kicked Kuntz some more. Willis sprayed Kuntz with a chemical agent as they left the cell.

Kuntz was quiet for a time, but then started to yell and kick the cell door again. Hale testified that at approximately 5:00 p.m., the petitioner told him that he had already hit Kuntz in the head and instructed Hale to "take care of the situation." Hale understood the petitioner to mean that he should do whatever it took to make him stop beating the door. This time, Hale, Finley, and Willis went into the detox cell. Kuntz backed away, and Hale pushed him into the bench next to the wall. The right side of Kuntz's head was facing Hale and the left side was four or five inches from the wall. Hale admitted that he delivered three or four "full power" punches to the right side of Kunz's head. Each time, the left side of Kuntz's head bounced off the wall and made a "cracking sound." The officers left Kuntz holding his head and moaning. Hale told the petitioner that he had "taken care of it."

Willis took a call from Kuntz's mother, who advised him that Kuntz had undergone

brain surgery a year or two earlier. Willis told Hale and the petitioner about the call. Hale looked worried, but nothing was done. When Hale returned to the cell at 6:00 p.m. to advise Kuntz of the charges, Kuntz was conscious but did not respond to Hale. Between 7:00 and 7:30 p.m., Hale returned and found Kuntz lying on the bench, "passed out" in his own vomit. The petitioner and Hale had an inmate clean Kuntz up and turn him, so he did not choke if he vomited again. Kuntz was not responsive, but no medical attention was ordered. The petitioner testified that he thought Kuntz was extremely drunk and might have taken some pills.

Between 8:45 and 9:00 p.m., Hale went into the cell and found that Kuntz had vomited again. Hale and the petitioner cleaned him up and tried to arouse him by shaking him, patting him, and pouring a bucket of ice water over him. Kuntz did not move or show any signs of consciousness. Hale and the petitioner used ammonia smelling salts, which did not arouse him. They noticed that Kuntz would stop breathing until the salts were taken away. No steps were taken to get medical care at that time.

In the next hour, Willis checked on Kuntz and found him lying down with his eyes open. Kuntz did not respond to being shaken or having a light shown in his eyes. Willis alerted the petitioner, but nothing was done. At 10:00 p.m., Hale suggested they call his father, who was a judicial commissioner and had some EMT experience. The petitioner agreed. Hale's father arrived at approximately 11:00 p.m. and recommended that they call an ambulance. At that time, Hale told Finley not to worry about writing a report because he and the petitioner would take care of it.

When the ambulance arrived a little after 11:30 p.m., the EMTs evaluated Kuntz and determined that he was a level three on the level of consciousness scale-- the same level

as a deceased person. The EMTs had been dispatched for a case of possible alcohol poisoning, and neither the petitioner nor Hale told them or Hale's father that Kuntz had received repeated blows to the head. There was evidence that if the EMTs had known that Kuntz might have a head injury, he would have been airlifted directly to a trauma center. Instead, Kuntz went to a local Medical Center. Upon examination, doctors noted that Kuntz was wet, and his body temperature was ten degrees below normal. After a brain scan, Kuntz was then flown to a trauma center.

A neurosurgeon evaluated Kuntz, who was on a ventilator and had no brain stem reflexes. The doctor concluded he had a very large subdural hematoma that had caused irreversible brain damage. He added that Kuntz's low body temperature had exacerbated his condition because it interfered with normal clotting. Kuntz died when he was removed from the ventilator two days later.

Several doctors testified at trial that Kuntz's head injuries were consistent with blunt force trauma, and that such injuries are generally treatable if medical attention is sought in the first hours after a brain injury. It was also explained that within an hour of injury a person with a subdural hematoma would start to experience a progression of symptoms such as dizziness, headache, nausea, vomiting, sleeplessness, lethargic, and eventually unresponsiveness.

On January 26, 2006, following a twelve-day jury trial, the petitioner was found guilty on all Counts of the Indictment except Count 8. Regarding Count 2 of the Indictment, the jury found that bodily injury to Kuntz resulted from acts that violated 18 U.S.C. § 242, but that his death did not result from those acts. However, with respect to Count 3 of the Indictment the jury not only found the petitioner guilty of violating 18 U.S.C. § 242, it also

found that Kuntz's death resulted from said violation.

On July 7, 2006, the petitioner was sentenced to life imprisonment on Count 3 and ten years on each of the other counts of conviction, to run concurrently.

The petitioner appealed his life sentence to the United States Court of Appeals for the Sixth Circuit, which affirmed the sentence. ***United States v. Conatser***, 514 F.3d 508 (6th Cir. 2008). Thereafter, the petitioner sought a writ of certiorari from the United States Supreme Court, which denied the same on October 14, 2008. ***Marlowe v. United States***, 555 U.S. 963 (2008)

On October 5, 2009, the petitioner, by counsel, filed a Motion to Vacate, Set Aside, or Correct Conviction and Sentence under 28 U.S.C. § 2255. The petitioner alleged that his counsel rendered constitutionally ineffective representation prior to trial by (1) failing to correctly calculate and advise him of the sentence he faced if found guilty, and (2) failing to recommend that he accept the government's plea offer.

On February 12, 2010, the district court entered a decision denying the petition. ***Marlowe v. United States***, 2010 WL 582193 (M.D. Tenn. Feb. 12, 2010). The district judge gave a lengthy recital of the decision issued by the Sixth Circuit in denying the petitioner's direct appeal. The district judge also thoroughly set forth the standard for establishing ineffective assistance of counsel. The court then found it was unnecessary to hold an evidentiary hearing because the record conclusively established that the petitioner was not entitled to relief. In addition, the district judge indicated that a certificate of appealability would not issue because the petitioner had failed to make a substantial showing of the denial of a constitutional right.

On December 22, 2010, the Sixth Circuit denied the petitioner's application for certificate of appealability.

## Analysis

In support of his § 2241 petition before this Court, the petitioner relies on the Supreme Court's decision in **Burrage v. United States**, 571 U.S. 204 (2014). More specifically, the petitioner argues at the time of his § 2255 motion, the law in the Sixth Circuit did not require a finding of "but for" causation for the enhanced statutory maximum under 18 U.S.C. § 242.

This Court agrees with the finding of the Magistrate Court that **Burrage** has been held to be retroactive on collateral review in the Sixth Circuit. As noted by Judge Mazzone:

> The Courts of Appeals for the Fifth, Sixth, Seventh, and Eighth Circuits have held that the rule is retroactive. See **Harrington v. Ormond**, 200 F.3d 246, 249 (6th Cir. 2018) ("It is also clear that **Burrage** is retroactive, as the Government commendably concedes. Substantive decisions that 'narrow the scope of a criminal statute by interpreting its terms' apply retroactively to cases on collateral review." (citations omitted)); **Santillana v. Upton**, 846 F.3d 779, 784 (5th Cir. 2017) ("In sum, as a substantive decision narrowing the scope [of] of a federal criminal statute, **Burrage** applies retroactively to cases on collateral review."); **Gaylord v. United States**, 829 F.3d 500, 505 (7th Cir. 2016) (holding that **Burrage** narrowed "the 'death results' enhancement of 841(b)(1)(C) and thus retroactively"); **Krieger v. United States**, 842 F.3d 490, 497-500 (7th Cir. 2016) (collecting cases in which the

>Government conceded that **Burrage** announces a substantive rule that must be applied retroactively on collateral review and holding that, even without the concession, the Court would reach the same conclusion); **Ragland v. United States**, 784 F.3d 1213, 1214 (8th Cir. 2015) (accepting a similar concession by the Government). However, the Third and Fourth Circuits have reached opposite conclusions. See **Dixon v. Warden of FCI Schuylkill**, 647 F. App'x 62, 64 (3d Cir. 2016) (rejecting the argument that **Burrage** is retroactive and concluding that a prisoner cannot rely on that case to bring a petition under 28 U.S.C. § 2241) and **Atkins v. O'Brien**, 148 F.Supp. 3d 547, 522 (N.D. W.Va. 2015) (holding that **Burrage** "has not been applied retroactively to cases on collateral review"); aff'd 647 F.Appx 254, 255 (4th Cir. 2016) (affirming "for the reasons stated by the district court").

[Doc. 13, p. 17-18].

More recently, **Burrage** was found to be retroactive in **Obi v. United States**, 797 Fed.Appx. 926 (6th Cir. 2019).

This Court also agrees with Magistrate Judge Mazzone that in **Hahn v. Moseley**, the Fourth Circuit held that when evaluating substantive claims under the savings clause, the Court must "look to the substantive law of the circuit where the defendant was convicted," but follow Fourth Circuit procedural law. **Hahn v. Moseley**, 931 F.3d 295, 301 (4th Cir. July 24, 2019), citing **In re Davenport**, 147 F.3d 605, 611-12 (7th Cir. 1998); **Eames v. Jones**, 793 F. Supp.2d 747, 750 (E.D. N.C. 2011).

As Judge Amy Barrett wrote in her concurring opinion in **Chazen v. Marske**, 938

F.3d 851, 864-65 (7th Cir. 2019):

> It also raises the stakes for the choice-of-law question that we do not resolve today: which circuit's law applies to a *Davenport* petition.  Chazen's case illustrates the point.  Chazen was convicted in the Eighth Circuit, so its law governed his trial, sentencing, direct appeal, and first § 2255 motion.  Even now, there is no controlling law in the Eighth Circuit on which Chazen could base a claim for relief, so a collateral attack filed there would fail.  But a § 2241 petition is filed in the circuit of confinement, and seeking the benefit of *Van Cannon v. United States*, 890 F.3d 656 (7th Cir. 2018), Chazen argues that we should apply Seventh Circuit law to resolve his petition.
>
> We should be skeptical of this argument.  Applying the law of the circuit of confinement risks recreating some of the problems that § 2255 was designed to fix. *See United States v. Hayman*, 342 U.S. 205, 210–19 (1952) (explaining that § 2255 directs post-conviction litigation to the district of conviction to avoid the practical problems that existed before § 2255, when all litigation was brought by a writ of habeas corpus in the district of confinement); *see also* HART & WECHSLER [THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1362 (Richard H. Fallon Jr. et al. eds., 7th ed. 2015)] at 1356 (cataloguing the issues courts faced before § 2255's enactment). We have never decided the issue, but district courts confronting it have concluded that the law of the circuit of conviction applies.  As one court explained:

9

> The rule ensures that the law that prevails in the judicial circuit of any federal prisoner's conviction, or a substantially similar law, is the law that will be applied to the prisoner's § 2241 petition seeking vacation of a conviction.  Application of the law of the place of conviction is a consistent, reasonable rule, as is evidenced by the requirement that § 2255 motions be filed in the district of conviction.  The rule [petitioner] believes appropriate—applying the substantive law of the place of confinement—is actually far more arbitrary.  Such a rule would base the choice of law decision on the fortuitous placement of a prisoner by the Bureau of Prisons, not the more rational factor of the place of conviction.
>
> *Hernandez v. Gilkey*, 242 F.Supp.2d 549, 554 (S.D. Ill. 2001); *see also Cano v. Warden USP–Terre Haute*, 2018 WL 3389746 (S.D. Ind. July 12, 2018); *Roberts v. Watson*, 2017 WL 6375812 (W.D. Wis. Dec. 12, 2017); *accord Burgess v. Williams*, 2019 WL 2641902 (N.D. Ohio June 27, 2019); *Eames v. Jones*, 793 F.Supp.2d 747, 749 (E.D. N.C. 2011). This position has force.

938 F.3d at 864-65.

This is relevant to this case because in same opinion that made *Burrage* retroactive in the Sixth Circuit, the Court notes that the standard for meeting the savings clause has a requirement that is not present in the Fourth Circuit standard - that is, that the petitioner

must also be determined to be "actually innocent:"

> Ordinarily, a federal prisoner may collaterally attack the validity of his conviction or sentence only under 28 U.S.C. § 2255. *See **United States v. Peterman***, 249 F.3d 458, 461 (6th Cir. 2001).  However, the so-called savings clause, found at § 2255(e), permits a federal prisoner to petition under § 2241 if "the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention."  To obtain relief under the savings clause, the prisoner must not only be barred from proceeding under § 2255 (which Harrington is), but must also be determined to be "actually innocent." ***Wooten v. Cauley***, 677 F.3d 303, 307 (6th Cir. 2012).

***Harrington v. Ormond***, 900 F.3d 246, 249 (6th Cir. 2018).

In the Sixth Circuit, a savings-clause petitioner can show actual innocence by demonstrating: (1) the existence of a new interpretation of statutory law, (2) which was issued after the petitioner had a meaningful time to incorporate the new interpretation into his direct appeals or subsequent motions, (3) is retroactive, and (4) **applies to the merits of the petition to make it more likely than not that no reasonable juror would have convicted him.**  *Id*., citing ***Wooten v. Cauley***, 677 F.3d 303, 307-08 (6th Cir. 2012) (emphasis added).

In fact, earlier this year, the Sixth Circuit expressly declined to adopt the rule in ***United States v. Wheeler***, 886 F.3d 415, 428-29 (4th Cir. 2018), that a new decision from a circuit court (as opposed to the Supreme Court) could form the basis for the savings clause.  ***Hueso v. Barnhart***, 948 F.3d 324 (6th Cir. 2020).

This presents the kind of anomaly that § 2255 was designed to present. A defendant convicted and sentenced in the Fourth Circuit could not make the same challenge as Marlowe does here due to the fact that ***Burrage*** has never been held to be retroactive in this Circuit. On the other hand, a defendant convicted and sentenced in the Sixth Circuit could not make the same challenge in that Circuit without satisfying the actual innocence standard. For this reason, this Court believes that Mr. Marlowe should be required to show the actual innocence standard of the Sixth Circuit.

Where this Court strays from the findings of the R&R is the effect that ***Burrage*** has on Marlowe's conviction. In ***Hancock v. United States***, 2018 WL 1666119 (6th Cir. 2018), the Sixth Circuit considered a similar challenge. The Court described ***Burrage's*** holding as "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." ***Hancock*** at *1.

With respect to the counts of health care fraud resulting in death, the district court in ***Hancock***, instructed the jury:

The law provides that whenever death results from the violation, that is, health care fraud, a more serious offense is committed.

So, if you find the Defendant guilty of the health care fraud charged in Count 1 of the indictment you must also decide whether the Government has proven beyond a reasonable doubt that the death of Evelyn Lindsey resulted from the violation.

12

The district court gave similar instructions for the counts of unlawfully dispensing controlled substances resulting in death:

> The law provides that whenever death results from the use of controlled substances unlawfully dispensed or caused to be dispensed a more serious offense is committed.
>
> So, if you find the Defendant guilty of unlawfully dispensing or causing to be dispensed controlled substances, as charge[d] in Count 33 of the indictment, you must also decide whether the Government has proven beyond a reasonable doubt that the death of Evelyn Lindsey resulted from the use of the controlled substances.

*Hancock* at *2.

The Sixth Circuit held that "the instructions tracked the statutory language and, consistent with ***Burrage,*** allowed the jury to rely on the ordinary meaning of 'resulted from.' *See **United States v. Alvarado***, 816 F.3d 242, 247–49 (4th Cir. 2016) (affirming, post-***Burrage***, a district court's 'decision not to further define "death results from"'). The evidence presented at trial supported the jury's findings that the deaths 'resulted from' Hancock's criminal actions. *See **United States v. Hancock***, 473 Fed.Appx. 424, 427–29." ***Id***.

In another case from a Sixth Circuit district court the Court held that, "[p]etitioner has based his claim of actual innocence upon the Supreme Court's decision in ***Burrage v. United States***, 571 U.S. 204 (2014). ***Burrage*** applied the 'but-for cause of the death or injury' standard to 21 U.S.C. § 841(b)(1)(C). ***Id***. at 219. In petitioner's direct appeal, the

Sixth Circuit Court of Appeals upheld petitioner's convictions under a different statute's penalty enhancement, 18 U.S.C. § 242.  There, the Sixth Circuit concluded that 'proximate cause is the appropriate standard to apply in determining whether a health care fraud violation "results in death."'  This Court instructed the jury as to this appropriate standard, therefore, **Burrage** does not entitle petitioner to relief.  In addition, the standard applied to petitioner's case was actually a stricter causation standard than the one applied in **Burrage**.  Therefore, petitioner could not have been prejudiced by the application of a stricter standard.  Petitioner's claim of actually innocence is denied." **Martinez v. United States**, 2019 WL 1559175, *4 (N.D. Ohio April 10. 2019) (Nugent, J.).

The instructions given and approved in **Hancock** and **Martinez** were virtually the same as those given in this case.  Accordingly, under Sixth Circuit substantive law, Mr. Marlowe's **Burrage** claim must fail.

The same would be true under Fourth Circuit law.  In **United States v. Alvarado**, 816 F.3d 242 (4th Cir. 2016), the Fourth Circuit considered a case where the evidence showed that "without the heroin, [the decedent] doesn't die."  The trial court instructed the jury using the statutory "resulting from" language.  The Fourth Circuit, on direct appeal, found that the district court was not required to give a clarifying instruction advising the jury that it could not convict if it found that heroin was only a contributing cause of the victim's death.

Similarly, in **Hyles v. Breckon**, 2020 WL 1277227 (W.D. Va. March 17, 2020), the jury had been instructed "that the government had to prove 'the death of Coy L. Smith, Sr., resulted.'  **Hyles**, No. 1:01-CR-00073, Dkt. No. 555 at 54, 56, 57."  The Court, on § 2241

review, held that the instruction given was different than the jury instruction found to be insufficient in ***Burrage***, in which the jury was merely instructed that it could find the element of causation satisfied if the drugs sold by the defendant were a "contributing factor" in the death. The Judge added that "[e]ven if the case's holding applies more broadly, though, ***Burrage*** involved a case where 'there was no evidence ... that [the victim's] heroin use was an independently sufficient cause of [the victim's] his death.' ***Burrage***, 571 U.S. at 215. In Hyles's case, by contrast, there was ample evidence that the conspiracy and acts in furtherance of it were an 'independently sufficient cause of the victim's death.'" ***Hyles*** at *6.

In ***United States v. Coll***, 762 Fed.Appx. 56, 59 (2d Cir. 2019), the Second Circuit considered an appeal of a case in which a former corrections officer was convicted of causing a pretrial detainee's death. The Court ruled as follows:

> Coll contends that the portion of the charge stating that "the government need only prove that bodily injury or death was a natural and foreseeable result of the acts," erroneously referenced "bodily injury." He argues that this language could have allowed the jury to convict Coll for causing Spear's death even if it concluded that only bodily injury, rather than death, was a natural and foreseeable result of Coll's conduct. Even assuming for the sake of argument that this language were erroneous, any error would not have prejudiced Coll because the Government presented overwhelming evidence that death itself was a natural and foreseeable result of Coll repeatedly kicking Spear, whom he knew suffered from serious health problems, in the head. We thus find no plain error in this instruction.

15

762 Fed.Appx. at 60.

In the present case, the trial court gave an instruction that satisfies the standards of the Sixth (and Second) Circuits.  The instructions being proper, the conviction must stand.

This Court must also take issue with the Magistrate Judge's finding that "there appears to be no evidence that the petitioner died due to the petitioner's failure to provide medical assistance." [Doc. 13, p. 23].

In fact, "[s]everal doctors testified at trial that Kuntz's head injuries were consistent with blunt force trauma, and that such injuries are generally treatable if medical attention is sought in the first hours after a brain injury.  It was also explained that within an hour of injury a person with a subdural hematoma would start to experience a progression of symptoms such as dizziness, headache, nausea, vomiting, sleepiness, lethargy, and eventually unresponsiveness." **United States v. Conatser**, 514 F.3d at 512-518.

In fact, when one carefully considers the jury verdict, it is apparent that the jury found beyond a reasonable doubt that the death was caused by the withholding of timely medical treatment.  With respect to Count 2, the jury found that the defendant had beaten the decedent, but did not find that to be the cause of death.  When the jury then found on Count 3 that the defendant withheld treatment and that caused the death, it was tantamount to a finding, beyond a reasonable doubt, that the sole proximate cause of death was the withholding of treatment.

In summary, the instructions were proper, the sole cause of death was the defendant's withholding of medical treatment, and the defendant is not actually innocent of the charge.

For the reasons stated above, this Court **DECLINES TO ADOPT** Magistrate Judge

Mazzone's Report and Recommendation (R&R) [**Doc. 13**] and **DENIES** the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 [**Doc. 1**].  The respondent's Motion to Dismiss [**Doc. 10**] is **GRANTED**.  This case shall be **DISMISSED** and stricken from the docket of this Court.  The Clerk is directed to enter judgment in favor of the respondent.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: April 28, 2020.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE